**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**BEAUFORT DIVISION**

| | | |
|---|---|---|
| DANIEL J. CAREY, | ) | Civil Action No.: 9:25-cv-01064-RMG-MHC |
| | ) | |
| Plaintiff, | ) | |
| | ) | **COMPLAINT** |
| vs. | ) | **Violation of Title VII:** |
| | ) | **Discrimination Based Upon Gender;** |
| SIEMENS HEALTHCARE | ) | **Retaliation;** |
| DIAGNOSTICS, INC./SIEMENS | ) | **Violation of the ADEA:** |
| HEALTHINEERS USA, | ) | **Discrimination Based Upon Age;** |
| | ) | **Retaliation** |
| Defendant. | ) | |
| _____ | ) | **JURY TRIAL DEMANDED** |

The plaintiff, complaining of the acts of the defendant, alleges as follows:

1.    That the plaintiff is a citizen and resident of the County of Beaufort, State of South Carolina.

2.    That, upon information and belief, the defendant Siemens Healthcare Diagnostics, Inc./Siemens Healthineers USA ("Siemens" or "defendant") is a foreign corporation doing business and maintaining offices and agents in the County of Beaufort, State of South Carolina.

3.    That this court has federal question jurisdiction of the above-styled action pursuant to 42 U.S.C. § 2000e-2, 42 U.S.C. § 2000e-3 and 42 U.S.C. § 2000e-5 ("Title VII"); 29 U.S.C. § 623, et seq. (the Age Discrimination in Employment Act or "ADEA"); and 28 U.S.C. § 1331.

4.    That venue for all causes of action stated herein lies in the District of South Carolina, Beaufort Division, as defendant does business in said district, plaintiff resides in the

district, and a substantial portion of the facts giving rise to plaintiff's claims occurred in the said district.

## CONDITIONS PRECEDENT

5.    That plaintiff has exhausted all administrative remedies and conditions precedent, including timeliness, deferral and all other jurisdictional requirements necessary for the maintenance of the foregoing action, all of which are more fully described below.

6.    That at all relevant times as defined by Title VII and the ADEA, defendant employed over fifteen (15) and over twenty (20) or more employees as required by said Acts.  As such, the defendant is an "employer" as defined by Title VII and the ADEA and is otherwise subject to and covered by said Acts.

7.    That on or about May 24, 2024, and as a result of defendant's discriminatory conduct, all of which is more fully described below, plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination and retaliation based on age and gender (all in the form of termination).

8.    That on or about January 31, 2025 plaintiff received a Notice of Right to Sue from the EEOC regarding the Charge of Discrimination described in Paragraph 7 above.

9.    That plaintiff has timely filed the foregoing action within ninety (90) days of the date on which he received the Notice of Right to Sue described above in Paragraph 8.

## FACTUAL ALLEGATIONS

10.    That plaintiff hereby repeats and realleges each and every allegation contained in Paragraphs 1 through 9 hereinabove as fully as if set forth verbatim.

11.    That plaintiff is a 63-year-old Caucasian male, having been born in 1960.

2

12. That in or around April of 2019 plaintiff was hired by the defendant as its new Regional Vice President ("RVP") for its Southeast Region.

13. That prior to coming to defendant, plaintiff spent the last 30 years working in sales – an area of business where plaintiff displayed natural talent and abilities. For the last 10 or so years before employment at defendant, plaintiff worked in management-level sales jobs of all kinds, specifically in the healthcare industry.

14. That defendant is in the business of selling critical Point of Care patient diagnostic equipment. Specifically, the Critical Care side of the business sells Point of Care Gas blood testing equipment which comes in two different forms: a handheld unit called an EPOC (the newer device) and a larger desktop version, or what's known as a RapidPoint 500e. Both devices allow a healthcare provider to draw a patient's blood and get results back in four to six minutes. The handheld, newer, device is state of the art, but it does have some issues that are still being worked out – e.g., upon information and belief it has an error rate of between around 10-20%. The Primary Care side of the business Point of Care sells urinalysis machines and diabetes testing machines, which can quickly detect diabetes. For the most part, this case involves the EPOC handheld device. As to that product, defendant's main competitor is Abbott Laboratories, who sell an older, more basic, yet more reliable, handheld blood testing device.

15. That in or around April of 2019 plaintiff was interviewed for the Regional Vice President position by his prospective direct supervisor, Aaron Starnes ("Starnes"), a Caucasian male who was the Area Vice President for Point of Care North America at the time, and his supervisor Maria Garcia ("Garcia") (approximate age 45-50), a Hispanic female and the Vice President for Point of Care, North America. While both Starnes and Garcia interviewed

and hired plaintiff, Starnes was the primary decision maker in selecting plaintiff for the job and Garcia, for the most part, only "signed off" on the hiring.

16.     That as to plaintiff's chain of command and the general reporting structure at Siemens, from 2019 to 2021 (in the beginning until the mid-point of plaintiff's employment) plaintiff had a sales team of about 11 to 13 sales representatives reporting to him, all of which assisted plaintiff in selling the products described above. At plaintiff's level in 2019 to 2021 there were a total of five (5) Regional Vice Presidents, including plaintiff, each with their own territory and each with our own sales team. In 2019 to 2021 all five (5) of the Regional Vice Presidents were male. Specifically, the five (5) RVP's during that time were as follows:

| | | |
|---|---|---|
| Dave Condon ("Condon") | male | Northeast |
| Daniel Carey ("Carey") | male | Southeast |
| Jim Luza ("Luza") | male | Southwest |
| Tom Wyatt ("Wyatt") | male | Northwest |
| Jeff Stoga ("Stoga") | male | Midwest |

17.     That each of the above Regional Vice Presidents reported to Starnes, the Area Vice President Point of Care North America ("AVP"). Starnes, as indicated above, is a white male and worked out of Kansas City, Missouri. He, in turn, reported to Maria Garcia, a Hispanic female who served as the company's Area Vice President, Point of Care and who worked out of Boston, Massachusetts. Garcia, in turn, reported to Christoph Pedain ("Pedain"), a Caucasian male, who was the Executive Vice President, Point of Care, North America.

18.     That in or around 2019 (after plaintiff was hired) the defendant hired Jennifer Zinn ("Zinn") (approximate age 45-50) as its Executive Vice President and Head of Diagnostics, North America. Zinn came to defendant from Roche Labs where she served as its Executive Vice President of Clinical Operations, and where, upon information and belief, she

4

developed a reputation for being outspoken in regard to women's rights in the workplace, particularly in upper management roles.

19.    That plaintiff understands from other Siemens' employees who worked at Roche at the same time Zinn worked there that Zinn practiced what she preached at Roche, opining publicly and privately about how women were better suited than men for higher-level management roles in corporate America and by, among other things, holding "all-female" meetings at national-level conferences.    Indeed, one of plaintiff's fellow Regional Vice Presidents, Jim Luza, worked at Roche during Zinn's tenure there and observed first hand Zinn's pro-female views, practices and her animus against upper-management male employees.

20.    That it did not take plaintiff long to see that Garcia shared Zinn's philosophy when it came to women belonging in upper management roles to the exclusion of competent male employees.    Plaintiff also noticed that, like Zinn, Garcia was an outspoken advocate for the placement of women in upper-management positions in the corporate world to the exclusion of competent men.    Garcia's views in this regard became more evident once she started to report to Zinn.

21.    That at the same time, as Executive Vice President of Diagnostics, Zinn had various Regional Vice Presidents reporting to her that were separate from plaintiff and his fellow RVP's (and outside of their chain of command) as they sold clinical chemistry equipment, a different product than what plaintiff and his cohorts were selling.

22.    That plaintiff came to find out that one such Regional Vice President, reporting to Zinn,  Lakesha Smith ("Smith") (approximate age 45-50), an African-American female, had the same pro-female/male animus and attitude that was advocated by Zinn and Garcia.    Not surprisingly, these attitudes became pronounced once Smith started to report

directly to Zinn.  Not only did Smith report directly to Zinn but, upon information and belief, Zinn mentored Smith and groomed her for higher-level positions with the company.

23.    That while the well-known anti-male views of upper-level female employees like Zinn and Garcia were troublesome to plaintiff, he had not yet been negatively impacted by them in the workplace – at least not from what plaintiff could tell, and so at the time plaintiff did not raise the issue with the defendant.

24.    That in or around February of 2021 defendant decided to expand its RVP's from five (5) to six (6), so they hired Tommy Dyer ("Dyer") as RVP of the South Central Region - a region that included Texas.  Thus, at this point defendant employed six (6) RVP's, including Dyer.

25.    That the first three years of plaintiff's employment at defendant (from in or around the spring of 2019 until in or around the spring of 2022) were good years for plaintiff. Plaintiff liked his job; he was good at it; and plaintiff enjoyed the people he worked with there, including his subordinates, coworkers, and clients alike.

26.    That plaintiff is a seasoned and experienced sales executive and leader. Throughout plaintiff's employment with defendant he performed his job duties in an above-average fashion and in a fashion that met defendant's expectations.  Plaintiff also maintained an excellent employment record there.

27.    That to this end, defendant did not provide its Regional Vice Presidents with yearly written performance evaluations.  However, defendant did require its RVP's to meet certain sales metrics; it published a running summary of how each RVP was performing in each of their zones, and it ranked the RVP's against one another.  It also gave its Regional Vice

Presidents awards and recognitions; it provided them with input on their performance by email and verbally; and each year the RVP's were eligible for a merit raise.

28.    That as to plaintiff's first three years at defendant, his level of outstanding performance is evidenced by the following:

a)  Plaintiff (and his sales representatives and region) consistently met nearly all metrics and sales goals and often placed number one out of all six or seven regions.  If they did not place number one for any given period, then they would, at worst, place number two or three;

b)  Plaintiff's supervisors, and upper management in general, repeatedly told plaintiff that he did a good job; that he was a strong performer; and/or they praised plaintiff verbally in relation to his job performance and work ethic;

c)  In fiscal year 2020, plaintiff generated $50 million in revenue for defendant, which represented an 85% increase in growth compared to revenue generated in the previous year;

d)  Also in 2020 plaintiff was the recipient of the Siemens Healthineers Apex Zone of the Year Award for fiscal year 2020 (an award which recognizes outstanding sales and performance);

e)  In fiscal year 2021 plaintiff generated $54 million in revenue for the company, achieving 98% of his revenue target for that year;

f)  In fiscal year 2022 plaintiff was awarded the Siemens Healthineers Crest Zone of the Year Award for outstanding sales and performance;

g)  Plaintiff always received a positive informal performance review via email at the end of the year; and

h)  Plaintiff always received a merit raise each year (whenever they were given).

29.    That as to discipline, plaintiff only received one written warning during his first three years at the defendant.  In or around 2020 Starnes wrote up plaintiff for allegedly speaking too loud to a member of his sales team. In giving the warning to plaintiff, Starnes

expressly told plaintiff not to worry about it and that he and Zinn were not happy that they were required to give the warning to plaintiff.  Other than that, plaintiff's employment record at defendant was perfect.

30.    That compared to plaintiff's first three years at defendant, 2022 was an eventful year.  In December of 2021 or January of 2022 while defendant had six (6) RVP's, it became known that Dyer, the RVP for the South Central Region, was taking a new position with the company and that Garcia (and to a lesser extent Starnes) had to hire a new RVP for that region, which included the Dallas, Texas market.  Upon information and belief, in or around January or February of 2022 defendant posted the position internally and externally (on LinkedIn per company policy).

31.    That it just so happened plaintiff knew a male named Tony Saporito ("Saporito") who lived in the Dallas area who was extremely qualified for the position and who had significant experience so, in or around December of 2021 or January of 2022, plaintiff called Saporito and told him about the job opening and encouraged him to apply for the position.  Saporito was very interested in the position and he did, in fact, apply for it.  At the same time, plaintiff called Starnes, who was in his office in Kansas City (plaintiff was in his office in Hilton Head) and told him about Saporito; that Saporito was a strong and highly-qualified candidate; and plaintiff summarized Saporito's qualifications to Starnes.  Plaintiff also sent Starnes Saporito's resume.  Starnes appeared to be open to considering Saporito

32.    That a couple weeks later plaintiff called Saporito and asked him about his application with defendant.  In response, Saporito advised plaintiff that he had not even been contacted by defendant yet.  Given Saporito's qualifications, plaintiff was confused as to why he had not been contacted by defendant.  He was exactly the kind of RVP the defendant needed.

33.     That again sometime in January or February of 2022 plaintiff called Starnes from his office in Hilton Head.  When Starnes answered the phone in his office in Kansas City, plaintiff asked him why Saporito had not been contacted for the RVP job. After a short pause, Starnes lowered his voice and said, "Dan, I will tell you in confidence, just between you and me, that I've been told that I can only hire a woman for the position."  Plaintiff expressed surprise at the statement because that did not seem legal to plaintiff.  Thereafter, the conversation ended.

34.     That based on plaintiff's chain of command at the time, and the way Starnes made his remark to plaintiff, plaintiff can state with confidence that Garcia, and perhaps other female leadership, directed Starnes that he could only hire a woman for the position. Defendant ended up hiring May Coleman ("Coleman") into the position.  In plaintiff's opinion, Mr. Saporito was far more qualified and experienced for the job than Coleman.

35.     That in or around March of 2022, Starnes (plaintiff's direct supervisor) announced he was leaving the company effective April 20, 2022.  Also in or around April of 2022, Pedain likewise resigned from the company.  The following month (May of 2022) Zinn resigned from defendant, upon information and belief, for performance-related reasons.  At some point around this timeframe Tom Wyatt was fired and Jason Lam was hired to replace him.

36.     That after Zinn resigned, senior leadership hired another, younger, female to replace Zinn.  After Starnes resigned, sometime in or around the spring and summer of 2022 Garcia began efforts to find a replacement for Starnes – plaintiff's prior direct supervisor.  It is plaintiff's understanding that Garcia had full authority to find and hire Starnes' replacement.

37.     That in the meantime, from in or around April of 2022 until in or around July of 2022 while Garcia conducted her search to replace Starnes, plaintiff and his fellow Regional Vice Presidents reported directly to Garcia on an interim basis.  As always, during this

time period plaintiff performed his job in an exemplary fashion, Garcia observed plaintiff's performance, and Garcia never disciplined or admonished plaintiff in any way, so she was well aware of plaintiff's talents as an RVP.

38.     That plaintiff is not intimately familiar with the details of the search to replace Starnes.  Plaintiff does know that sometime in or around June or July of 2022 Garcia interviewed Lakisha Smith, the African-American female who had been mentored by Zinn and who had reported to her for some time.  It is also known (or plaintiff came to find out) that Smith, like Zinn and Garcia, held outspoken opinions and beliefs about females occupying upper management roles at the expense of men – even more qualified men.

39.     That around this same time, at least two or three of plaintiff's fellow RVP's approached plaintiff, unsolicited, and encouraged plaintiff to apply for the Area Vice President job left open by Starnes' resignation, telling plaintiff they would like to work for or under plaintiff.  Based upon the encouragement from his fellow RVP's, plaintiff called defendant's Vice President of Marketing, Gian Sachdev (Sachdev"), to get further input.  In response, the Vice President of Marketing told plaintiff that he would be a "phenomenal" or "great" Area Vice President and leader and he, too, encouraged plaintiff to apply for the position.  The encouragement aside, plaintiff was very qualified to be the new AVP; he had 14+ years of experience in sales compared to Smith, who plaintiff estimates had only about 7.9 years of such experience; and plaintiff had experience selling the very product that the new AVP would be required to sell in adequate quantities.  In contrast, Smith had no experience selling or supervising the sale of EPOC devices.  In fact, plaintiff had more sales experience than Garcia, who plaintiff estimates had approximately 12.25 years of sales experience.  The only experience plaintiff lacked was that he never managed managers.  However, Smith never did either.

40.     That given the above, sometime in June or July of 2022 (after Smith was interviewed) plaintiff timely applied for the position and was interviewed for the position by Garcia.  Despite plaintiff's qualifications for the job, he felt the interview was not a serious or meaningful one.  It felt superficial and as though a candidate had already been selected.  Many of the questions Garcia asked plaintiff were not really relevant to whether he was qualified for the position.  For example, during the interview Garcia asked plaintiff to identify the areas where she (Garcia) needed to improve as a manager in her own job.

41.     That not surprisingly, Garcia hired Smith, as the new AVP - the female who shared Garcia's (and Zinn's) views on women's rights in the workplace – despite the fact that plaintiff was more qualified for the job.

42.     That in or around July of 2022 Smith started to perform her job duties as the Area Vice President, with plaintiff and the other RVP's reporting directly to her.

43.     That once Smith occupied the position, it did not take long to notice that Smith displayed an open disdain for males in the workplace and that she treated the male employees in a less-favorable fashion than she treated the female employees.  For example, plaintiff (and others) noticed that she treated male employee with less respect and civility than she treated similarly-situated female employees.  Smith was friendlier, more open to dialogue, and more receptive to the opinions and ideas of female employees than she was to male employees.  In general, and in contrast to the way she treated female employees, Smith was often short, dismissive and antagonistic to male employees, to the point where her interactions with males were rude.  She was not open to meaningful dialogue with males, including plaintiff, and when she did appear to converse with men, she would roll her eyes when they spoke, check her cellphone for text messages and emails, read and send text messages and emails, and otherwise

appear as if she was being bothered and did not have time for the discussion. Smith also nitpicked the male employees' job performance more than similarly-situated female employees and just seemed to have a dislike towards men.

44.     That after May Coleman was hired as an RVP, plaintiff began to hear comments that she had some performance issues, including poor communication skills in regard to her supervisors and clients, that her communication deficiencies caused her to lose several large accounts, resulting in significant financial loss to defendant, and that, while her accounts were in jeopardy, Coleman failed to update her supervisor who, at the time, was Garcia. Eventually those same accounts were lost because of Coleman's malfeasance.

45.     That despite these serious work rule violations, Smith and Garcia did not discipline Coleman. On the contrary, in or around October of 2022 Garcia and Smith **promoted** Coleman, the RVP for defendant's South-Central Region, to be the Head of Marketing and Sales Operations (a job that had previously been performed by two (2) male employees: Jason Weshler, Head of Sales Operations, and Gian Sachdev, the Marketing Director). Thereafter, Smith and Garcia made the decision to hire Kristen Hall ("Hall"), another young female, into Coleman's vacant position. Hall had no sales or management experience and there were other, more qualified, male applicants for the position. At this point plaintiff's fellow RVP Jeff Stoga was given the task of covering Coleman's prior territory until a replacement for her could be found. In doing so, Stoga naturally interacted with Coleman's sales team, clients and supervisors. Thereafter Stoga began to tell plaintiff that, though Coleman had been promoted, he was being told how poor her performance was; how poor her communication skills were; and how she lost important clients because of her lack of skills.

46.    That at the time, it occurred to plaintiff that a male in the same circumstances as Coleman would have met with a much different fate. Plaintiff was not the only one with such thoughts.  Throughout the rest of 2022 and 2023, members of plaintiff's sales team, including female sales representatives, would repeatedly remark to plaintiff in their one-on-one weekly meetings and during field visits that defendant was openly discriminating against men by terminating competent management-level male employees for little or no reason and replacing them with less-qualified female employees or by hiring and promoting less-qualified female employees into management-level positions when more qualified male applicants were available.  These same employees would complain to plaintiff about Coleman and use that as an example of discrimination against males in the workplace.  Even several females on plaintiff's sales team openly remarked to plaintiff, Human Resources, and upper management that to get promoted at defendant you had to be a female.

47.    That plaintiff would also see the very same types of remarks, allegations and opinions regarding gender discrimination against males at defendant when he would read employee Peakon surveys – surveys all of the employees at Siemens were required to complete on a monthly basis that allowed them to discuss or report any issues they felt should be addressed.  And it was not just sales representatives who would comment on the issue.  Several of plaintiff's fellow RVP's would make similar remarks to plaintiff about how bad gender discrimination against males was at defendant.

48.    That in or around October of 2022, Smith and Garcia fired the male Regional Vice President for the Northwest Central Zone or Midwest Region, apparently for dubious reasons.

49.     That from in or around February through in or around October of 2022, plaintiff (with the help of his sales team) was attempting to sell the EPOC handheld blood testing devices to Piedmont Hospital in Atlanta, Georgia.  (Piedmont was an existing customer of defendant, but for another product.)  As stated, the EPOC was a state-of-the-art device, but had existing issues including a finnicky nature and an error rate of 10-20%.

50.     That at first, the prospective sale of the EPOC devices to Piedmont was going well and it looked as though the sale was imminent.  Indeed, the decision makers at Piedmont Hospital told plaintiff they were going to go forward with the purchase of defendant's EPOC devices and that defendant's presentation and/or proposal to them was better than defendant's competitor, Abbott Laboratories, who sold a more basic device that was easier to learn, with a smaller error rate.  Of course, as an experienced sales executive, plaintiff kept his superiors up to date and involved as to the status of the defendant's account with Piedmont.

51.     That unfortunately, in or around November of 2022, matters took a quick turn for the worse on the Piedmont deal, when Piedmont advised plaintiff that it had decided to do business with Abbott Labs and purchase its product.  Piedmont's decision had nothing to do with plaintiff or his sales team but rather involved issues with the EPOC device itself.  Not only that, but plaintiff had concluded Piedmont was just using defendant's bids to get a better deal with Abbott.

52.     That on or about November 29, 2022, as soon as plaintiff was made aware of Piedmont's decision, he called Smith from his hotel room to tell her the news.  Consistent with the way Smith had come to deal with plaintiff, Smith yelled at plaintiff, falsely accusing him of not advising her of Piedmont's decision in a timely manner, and directing plaintiff to

schedule a call with Garcia and plaintiff's sales team the following day, a directive plaintiff immediately carried out.

53.     That on or about December 2, 2022 (in the midst of the Piedmont Deal) Smith met with plaintiff to verbally discuss plaintiff's year-end review with him. Four days later, on or about December 6, 2022, Smith sent plaintiff a one-page email which she characterized as a "year-end review" and "Q1 update," a document plaintiff had not received in the past. The email stated it was a summary of their December 2, 2022 meeting. The review Smith wrote for plaintiff was mostly positive, as Smith noted that plaintiff had ended the year in **_third place_** out of **_eight regions_**, she gave plaintiff a merit increase in pay, and an award of 172 shares of stock. In the bottom half of her email "review" Smith was critical of plaintiff for not selling or delivering enough EPOC devices and for changing his sales forecast to lower amounts at the last minute – an alleged issue she offered to help plaintiff improve upon.

54.     That on or about December 8, 2022, Smith and plaintiff spoke by phone about the Piedmont account. Later that day, Smith sent plaintiff an email recapping the above conversation. In her recap she alleged that plaintiff had mishandled the Piedmont account by failing to include certain upper-level management employees at defendant in his account updates; that plaintiff failed to attend a face-to-face call with a key decision maker at Piedmont, instead allowing his AE and KAE to handle the call; and that plaintiff failed to notify the proper employees of the potential loss of business, including her and Garcia, in a timely manner. However, plaintiff did include the appropriate upper-level management employees in his account updates. And, as plaintiff told Smith, as an RVP plaintiff had the discretion and authority to assign who would be on that call. Indeed, plaintiff and his AE, KAE, an RVP for key accounts discussed in detail who would make the call and, after much discussion, they determined that

plaintiff's AE and KAE would make the call as they were much closer to the sale. This was their job duty and they were very good at it.

55.     That on the last point, Smith asserts plaintiff learned that the account was in trouble at the NAAM Conference during the Cactus Event on or about November 9, 2022, but waited 20 days (until November 29, 2022) to report it to her. This is partially true, as on November 9, 2022, plaintiff discovered that Piedmont was considering purchasing the devices from Abbott, but that there had not been a final decision by Piedmont yet. At that point plaintiff made the judgment call to wait to tell Smith while he pursued two avenues: plaintiff was garnering the help of a defendant's employee who occupied a higher position than Smith within the company to try and save the deal, and plaintiff was gathering facts so that he could answer Smith's questions in the event the purchase failed. Even if Smith became aware that the deal was at risk two weeks earlier, there was nothing she could have done about it.

56.     That on or about December 14, 2022, plaintiff responded to Smith's email by sending an email to both Smith and Garcia correcting some of the points Smith made in her recap email. In essence, plaintiff advised that Piedmont had experienced several issues with defendant's novel EPOC device, including implementation, product performance, customer support, and pricing challenges. Plaintiff also reminded them that his team engaged multiple leaders across the business unit and that he did, indeed, update the appropriate employees at defendant throughout the history of the potential sale. In the end, plaintiff advised Smith that, in his professional opinion (based on years of experience) Piedmont was just using defendant as a negotiating tool to get Abbott to lower their prices.

57.     Thereafter, the issue was closed. Plaintiff was not disciplined in any fashion at the time in regard to the loss of the Piedmont account.

58.     That the year 2023 was also an eventful one for defendant and plaintiff in positive and not so positive ways.  In or around January of 2023, defendant announced that by June or July of 2023 it would begin to implement a restructuring or "transformation" that could affect some of the employees' jobs.  Of course, Garcia and Smith would be the decision makers in regard to these changes.

59.     That on or about February 28, 2023, plaintiff had his Team Zone meeting – a meeting where plaintiff and his entire sales team made a presentation to Smith, Garcia and others about the state of affairs in their zone or region and provided a general update to them. This type of meeting was not unique to plaintiff's Southeast Zone, as each RVP was required to present the same type of information at their own separate Team Zone meeting.

60.     That however, at plaintiff's team's February 28, 2023 Zone meeting, Smith used it as an opportunity to berate and disrespect plaintiff and other male members of plaintiff's sales team without cause, and in an open and discriminatory fashion, all as her direct supervisor, Garcia, looked on with approval, doing nothing to intervene or stop it.  Literally every time plaintiff addressed Smith with an idea, comment, or an update, Smith would roll her eyes (in exaggerated fashion) while looking at others in the room.  At other times, whenever plaintiff would attempt to communicate anything to her, Smith would look down at her phone and begin reading or sending text messages or emails.  She also engaged in this conduct when other males on plaintiff's sales team presented to her.  And, when she engaged in this conduct, she did so in an open and obvious manner, as if she wanted all in attendance to see.  Later in the meeting, Smith directed her attention to two white male members of plaintiff's sales team, aggressively tearing into them in a loud, antagonistic manner, yelling at them that, among other things, they were not making their numbers and that they would fail.  Yet their numbers were no worse than

any other sales representatives.  Indeed, one of these maligned sales representatives went on to be awarded Salesman of the Year that year.

61.    That significantly, when the male sales representative on plaintiff's team who handled the Piedmont account began to discuss it, Garcia curtly interrupted the sales representative, advised him the Piedmont sale was lost and over with, and she asked him to move on to another topic.

62.    That later, in debriefing plaintiff after the meeting, Smith remarked that she believed a female representative on plaintiff's team, Christine Taylor ("Taylor"), performed very well during her presentation; and that she (Smith) was impressed with her.  In reality, this female representative had only presented to Smith one time and Smith had no knowledge of her work performance, making it curious that this one sales representative had caught Smith's attention.  And, while Taylor had her strengths, there were clearly other male sales representatives who presented better and had stronger skill sets.  Yet Smith did not comment on them.  Ultimately plaintiff responded to Smith's apparent impulsive comment by stating, "It's funny you should say that, as [Taylor] still needs a lot more work and training."

63.    That in meeting with his team after the Zone meeting, most, if not all, of plaintiff's sales representatives noticed Smith's behavior and concluded that it was discriminatory against males, inappropriate and unnecessary.  In fact, they all discussed reporting Smith to Human Resources, but in the end plaintiff knew that the transformation was about to take place and he did not want to put himself or any member of his team in jeopardy of retaliation by making a complaint of discrimination in the midst of corporate uncertainty.  As such, nothing was done. In the meantime, the discrimination continued.

64.     That the following month (March of 2023), Jeff Stoga ("Stoga"), the RVP for the Central Zone, had his Zone meeting with Smith and Garcia. Stoga reported to plaintiff that Smith and Garcia behaved the same way in his Zone meeting as they did in plaintiff's – threatening, picking on and nitpicking him and the male members of his team without treating the female employees the same way.

65.     That in or around the end of April/beginning of May, 2023, a Town Hall Meeting was held via video wherein Garcia gave a recorded statement to the employees at defendant who could be affected by the transformation or reorganization announced at the beginning of the year and which was about to take place. In listening to it, plaintiff felt the announcement was harsher or colder than it needed to be and he could tell it would make some of his team members anxious or upset. To try and nip that in the bud, plaintiff called one such employee he suspected would be upset by the announcement, Candra LaRosee ("LaRosee"), because Garcia's announcement suggested her position would be significantly changed by the transformation. Plaintiff predicted correctly, and when he got LaRosee on the phone, she was indeed upset. After plaintiff spent some time explaining the situation to her, LaRosee regained her composure and told plaintiff she appreciated the call, that it calmed her down, and that plaintiff made her feel as if she had a future with the company. At no time did plaintiff contradict Garcia or lie to LaRosee in calming her down. Instead, plaintiff exercised his discretion as a supervisor and used his compassion as a human being to ensure morale in the workplace did not get out of control after Garcia's announcement.

66.     That as of May 2023 plaintiff was still extremely bothered by the way Smith and Garcia had been treating him and other males. Plaintiff continually struggled with whether he should file a complaint for gender and age discrimination with defendant's Human

Resources Department against Smith, Garcia, and the company as a whole. At the same time, plaintiff planned to work at defendant until his retirement and, as explained above, plaintiff did not want to jeopardize that plan by making a discrimination complaint while the company was going through a restructuring and when the prospect of the company doing anything about plaintiff's complaint was nonexistent. Frankly, plaintiff did not want to be retaliated against.

67.    That then, on or about May 19, 2023, as plaintiff struggled with his own feelings about Smith, matters came to a head when, out of the blue, Smith summoned plaintiff to her office and gave him a Final Written Warning for what she alleged as:

    a) A lack of communication around the lost business at Piedmont Hospital;

    b) The failure to work collaboratively with internal stock holders;

    c) Leadership issues; and

    d) Not following his manager's directions, insubordination, and not speaking to his manager about the status of key customers.

68.    That the discipline came as a complete surprise. This is the first time plaintiff saw Smith's (and Garcia's) discriminatory animus in such a way where it threatened him and his livelihood. Plaintiff knew that the Final Written Warning was discriminatory because it was false and it made no sense. Not only that, but Smith made the warning a "final" one by springboarding it off plaintiff's 2020 write up – a write up that was around three (3) years old, was based upon events that occurred before Smith supervised plaintiff, and was unrelated to any of the issues Smith identified in her Final Written Warning to plaintiff.

69.    That even more concerning, in plaintiff's discussions with Smith about the grounds for the discipline, plaintiff learned that the brunt of the discipline dealt with the lost Piedmont sale – a sale that was lost five (5) months ago; a lost sale that was discussed and

resolved by Smith, Garcia and plaintiff five months ago; and a lost sale that had nothing to do with plaintiff's performance, but rather was due to the new EPOC device and issues Piedmont was having using it. In fact, in plaintiff's professional opinion, Piedmont was simply using defendant's bids to lower the bids of their competitor, Abbott Labs, who eventually got the contract. Most importantly, it was a lost sale that did not involve plaintiff being disciplined for it at the time. To come back and discipline plaintiff for an issue that occurred and was resolved five (5) months earlier, and when the issue was not plaintiff's fault, violates all notions of due process and fairness and undermines the purpose of progressive discipline.

70. That plus, the allegation was false or, again, not credible. Plaintiff called Smith the very night he was advised by Piedmont that the deal was lost and gave her the news. Other than expressing a burst of inappropriate and misplaced anger at plaintiff, Smith directed plaintiff to schedule a meeting the following day with her and Garcia and plaintiff's sales team, a task plaintiff completed immediately. Thereafter, in response to an email Smith sent to plaintiff blaming him for the lost sale, plaintiff sent an email back to Smith, which he also copied to Garcia, explaining the real reason the Piedmont deal was lost, citing many factors, namely issues with the product and Piedmont using defendant's bids to lower Abbott's bids.

71. That after the above email exchange the entire matter was resolved by the three upper-level management employees: Smith, Garcia and plaintiff. At no time did plaintiff receive a verbal warning, written warning, or any other kind of formal discipline regarding the Piedmont matter. For all intents and purposes the Piedmont matter was over with in early December of 2022 without any discipline to plaintiff. Any thought that it was not entirely resolved at the time was put to rest on or about February 28, 2023 during plaintiff's Team Zone meeting, when one of plaintiff's sales representatives who had been involved in the Piedmont

deal attempted to give Smith and Garcia a presentation on the lost sale and was quickly shut down, being told the matter had been concluded.

72.     That number two on the final written warning alleges plaintiff failed to work in a collaborative manner with defendant's stockholders.  This matter was so minor plaintiff did not know what it meant.  As Smith explained it, apparently sometime in the past plaintiff gave another employee some directions to carry out in the course of a project.  The employee did not feel the task plaintiff asked him to perform was within the scope of his job duties and description.  Rather than objecting and discussing the matter with plaintiff, this employee said nothing to plaintiff about his garden-variety workplace irritations and, instead, complained to someone else about it.  The non-seriousness of this alleged offense, if it even was one, renders it false or not credible.

73.     That the third ground on Smith's Final Written Warning to plaintiff was characterized as "leadership" – a trait plaintiff takes great pride in possessing. Again, in reading the Final Written Warning, plaintiff did not know what this charge related to or had to do with. While the Final Warning merely contained the word "leadership" without detail, Smith advised plaintiff that the alleged offense referred to the discussion that plaintiff had with LaRosee after Garcia's presentation about the pending realignment.  (See Paragraph 65 above.)

74.     Apparently after plaintiff spoke with LaRosee, she spoke to the rest of her CSOL team about how panicked she became during Garcia's Town Hall presentation and how effective plaintiff's telephone call to her had been.  Regardless, this ground for plaintiff's Final Written Warning is also false.  Garcia was the employee whose presentation caused panic in the ranks.  It was Garcia who, during her presentation on a delicate matter, displayed a lack of leadership.  All plaintiff did was to anticipate and then allay the confusion and fear that Garcia

had created.  That is not a work-related offense.  After plaintiff explained the details of the incident to Smith, Smith stated in cavalier fashion that she would "give [plaintiff] this one" meaning she was withdrawing that ground for the discipline because, in retrospect, there was no violation of company policy.

75.    That the final ground for plaintiff's Final Written Warning involved "not following his manager's directions, insubordination, and not speaking to his manager about the status of key customers."  But like all else in the warning, the words do not fit any alleged offense.  Smith claimed that plaintiff did ***not*** speak to his manager about the status of his customers. Nothing could be further from the truth.  Like every other RVP, plaintiff had weekly, if not biweekly, "one-on-one" calls with Smith where that very topic was addressed.  Not only that, but every Monday all the RVP's (including plaintiff) had forecast calls with Smith, again where that very topic was brought up.  The talk of insubordination and not following plaintiff's manager's (Smith's) directions involved a meeting that took place even before the Piedmont deal was lost – some five (5) to six (6) months prior to this Final Written Warning.  During this meeting, Smith and all the RVP's (including plaintiff)  had a call with Siemens' Lab Diagnostic Corp. Account Team.  Smith knew plaintiff had issues with that team's lack of support in several areas.  Though Smith agreed with plaintiff (or would come to agree with plaintiff), she advised plaintiff before the meeting not to bring up his opinions about the team's lack of support during the conversation.

76.    That plaintiff truly tried to follow Smith's directive, but the entire meeting dealt with this issue in one way or another and admittedly plaintiff brought the issue up in an appropriate manner.  After that meeting, Smith called the issue to plaintiff's attention and the matter was resolved.  As with the Piedmont issues, or lack thereof, the incident occurred so long

ago and had already been addressed (so long ago) that it made little sense to bring it up some five (5) or six (6) months later in the context of a Final Writing Warning. To be sure, the entire Final Written Warning was false or lacked credibility, either because the alleged work rule violations were stale, nonexistent, or nonserious.

77.    That plaintiff was still having a hard time coming to terms with the extreme disciplinary action he was facing, especially since it was without merit and discriminatory. In addition to the false discipline, Smith and Garcia were harassing plaintiff due to his gender and age at least three or more times a week by, among other things, being rude, short and dismissive with plaintiff, nitpicking his work, and falsely admonishing plaintiff. While the looming transformation was still a consideration, the anti-male sentiment of upper management was now a stronger priority. As such, about four days later (on or about May 26, 2023) plaintiff complained to defendant's Human Resource Department and reported that he (and other males) were being discriminated against because of their gender and age. In making his initial complaint, plaintiff spoke to Chris Kobeski ("Kobeski"), defendant's Human Resource Director, Point of Care Division. In so doing, plaintiff cut to the chase and stated he felt that both Garcia and Smith were treating him less favorably than similarly-situated younger, female employees; that they were writing plaintiff up without cause; nitpicking plaintiff's work; trying to get rid of plaintiff; treating plaintiff and other males in a rude, antagonistic and contemptuous manner in the workplace; and threatening plaintiff and other males in an angry fashion. Plaintiff also stated that he was male, over the age of 55, and that he was being treated differently than younger females. Moreover, plaintiff complained that, to the extent he was receiving a Final Written Warning for communication issues, that May Coleman engaged in the same or worse alleged misconduct (and that she even lost major accounts over her conduct) and nothing happened to

24

her; that she was not punished like plaintiff was – instead, she was promoted into a Head of Marketing and Sales Operations position – a job previously occupied by two (2) men - and that a woman took over her old job. Plaintiff further reported Smith and Garcia's conduct towards him and other males at plaintiff's team's February 28, 2023 Zone meeting. And, while plaintiff characterized her February 28, 2023 conduct as a standard of conduct violation, Plaintiff made it clear that Smith's rudeness, eye-rolling, staring at her phone, and general antagonistic conduct during the meeting was only directed at the men. The above is a summary of the said conversation. Plaintiff's complaint regarding gender and age discrimination encompassed other details at defendant. The point is that on that day, May 26, 2023, plaintiff engaged in protected activity under Title VII and the ADEA.

78.    That prior to June of 2023, defendant had a travel policy for its sales employees and management but it was not burdensome or restrictive. If a salesperson deemed it necessary to travel in order to close a sale, they had absolute authority to do so and would submit an expense report to their supervisor when they returned.

79.    That in or around June of 2023, Garcia announced a verbal POC corporate-wide travel ban on the sales employees. More specifically, the verbal travel ban provided that any employee seeking to travel must request permission for the trip (and itemize potential expenses) to Garcia and Mike Nassif ("Nassif") for approval. The travel ban was not set forth in any company policy or procedure. It was not even in writing. It was verbal and it was extremely informal and vague in terms of the process and details for requesting permission to travel. Indeed, defendant did not provide any type of travel ban expense report form to its employees to use.

80.     That as such, different supervisors would seek different information from employees. Oftentimes employees seeking to travel did not know what type of information to provide to their supervisors. And, because of the vague and haphazard manner in which the travel policy was implemented, oftentimes the supervisor would end up making several requests to the employee to provide more information.

81.     That at some point shortly after this verbal travel policy went into effect, one of plaintiff's sales representatives needed to travel out of state to affect the sale of a significant amount of EPOC devices. Originally plaintiff had no intention of going on the trip. Thus, while plaintiff submitted a travel approval request for his employee, plaintiff did not include himself in the request. However, in speaking to Smith about the trip, plaintiff began to verbalize to her that, due to the size of the potential transaction, maybe plaintiff should go on the trip with his salesperson. When plaintiff raised the prospect of traveling with his team member, Smith was all for it. She agreed that plaintiff should go on the trip and encouraged plaintiff to do so, stating "OK," "good," "go on the trip and I will approve it."

82.     That well aware of the new travel rule, after his meeting with Smith plaintiff revised the travel request to include himself as one of the travelers, plaintiff submitted the information to Smith, and she approved it. That is the extent of that event.

83.     That several days later, on or about June 13, 2023, Smith sent a demeaning email to plaintiff falsely stating she was concerned that plaintiff did not understand the newly-implemented travel policy. She further asked plaintiff to send her an email confirming that he understood it. Again, Smith's concerns were suspiciously misplaced. Of course plaintiff understood the policy. Adding himself to a trip after deciding he should go on it had nothing to

do with how well plaintiff grasped the loose, ill-defined travel policy. Nevertheless, that same day (June 13, 2023) plaintiff sent an email to Smith confirming that he understood the policy.

84.    That in plaintiff's view this was harassment. It was unnecessary for a less-experienced, less-skilled sales/management employee to question plaintiff on a verbal travel rule. She already knew plaintiff understood it. It was not complicated. Plaintiff never violated the rule, and Smith never said plaintiff did.

85.    That finally, after sending several emails to defendant's Human Resources Department, on or about June 22, 2023 two female Human Resource employees, Molly Eason ("Eason") and Amanda Flick ("Flick"), met with plaintiff by a virtual call to question plaintiff about his complaint. At the start of the meeting, Flick and Eason told plaintiff that this meeting was not related to the complaints of discrimination he filed against Smith and Garcia. Instead, during this call they stated they were only investigating the events which occurred at plaintiff's February 28, 2023 meeting because, according to them, plaintiff characterized his complaints respecting that meeting as Code of Conduct violations. This is only partially correct. Plaintiff also alleged the actions of Smith and Garcia during the meeting were discriminatory and aimed at men and/or older males. Concerned that his complaints of discrimination were being mischaracterized or that he was being misunderstood, plaintiff again repeated that he was male, over 55 years of age, and that he was being discriminated against or being treated less favorably because he was an older male. Plaintiff also brought up his comparator evidence involving May Coleman, stating he never did anything wrong and Coleman did, yet he was the one being punished. As such, on that day (June 22, 2023) plaintiff engaged in protected activity for a second time. Once plaintiff's interviewers advised him that they were going to question plaintiff

a second time, on a different date, about his discrimination allegations, plaintiff understood and answered all questions asked of him.

86.     That also on or about June 22, 2023 plaintiff sent an email to Eason and Flick which contained an article explaining how damaging and offensive it is when a person in authority rolls their eyes at a person and how much damage such unprofessional behavior can have on the morale of a group.

87.     That on or about July 20 and 21, 2023, Flick and Eason sent plaintiff several emails containing written questions.  Of course, plaintiff responded to them all.  On or about July 21, 2023 plaintiff had his second interview with Flick and Eason.  As promised, this time the interviewers focused their questioning on plaintiff's discrimination claims. Plaintiff explained what he had already told them about his discrimination claims and more - thereby engaging in protected activity for a third time.

88.     That upon information and belief, Flick and Eason did undertake an investigation of sorts into plaintiff's allegations, but it was not an effective one.  For example, in exchanging emails with plaintiff, Flick and Eason only asked plaintiff one question related to his discrimination claims  - a question about May Coleman.  To this point, Flick and Eason wanted plaintiff to identify the name of the accounts and clients that Coleman had lost.  Plaintiff answered the questions and gave them the names of witnesses who could support his contention. For example, plaintiff asked his investigators to interview Jeff Stoga, who worked with Coleman at the time the accounts were lost, and Garcia, who supervised Coleman at the time.  Yet, upon information and belief, while they interviewed Stoga, Flick and Eason did not ask Stoga any questions about the accounts Coleman lost and they did not dig deep enough when interviewing Stoga and Garcia.

89.     That on or about August 10, 2023, Flick and Eason advised plaintiff that their investigation into his complaint was complete and that they could not substantiate any of plaintiff's allegations of discrimination against Smith and Garcia.  A bit dumbfounded, plaintiff asked them how they could have reached their conclusion given the information he provided to them.  Plaintiff then reiterated that he was a male, over 55 years of age, and that female management was discriminating against him because of his age and gender.  Plaintiff also again referred to May Coleman as a similarly-situated younger female employee who was treated more favorably than he was treated.  Thus, for the fourth time, plaintiff engaged in protected activity under Title VII and the ADEA.

90.     That sometime in the summer of 2023, while the above was going on, Smith and Garcia once again fired a long-time older male employee, Dave Condon, a male over the age of 45 who was the RVP for defendant's Northeast Zone.  Thereafter (and not surprisingly), Smith and Garcia again hired a younger female far less qualified than Condon into his position.

91.     That for most of plaintiff's employment at defendant, plaintiff's Southeast Region and plaintiff's sales team were assigned to handle defendant's MUSC account.  At some point, MUSC had purchased a significant number of defendant's hand-held EPOC devices.  Despite its ongoing "error rate" issues, plaintiff and his team handled the MUSC account with competency and attention.  Still, MUSC had some difficulties transitioning to the device and using it, just like many of defendant's other customers.

92.     That on or about July 18, 2023, Smith had been advised that MUSC had reported a concern with defendant's EPOC devices and that there was a chance that MUSC may not extend its contract with defendant for the devices – a contract that expired July 21, 2023.

93.    That on or about July 21, 2023 Smith sent plaintiff another demeaning email criticizing plaintiff in shotgun fashion for a number of issues – none of which were valid – blaming plaintiff for the loss of the MUSC contract, even though the contract had not been lost. This type of behavior by Smith towards plaintiff had become a course of conduct that constituted harassment.

94.    That in fact, the account was never lost.  All along plaintiff worked the account diligently, providing MUSC with hours and hours of training, guidance and advice. Indeed, plaintiff and his team were able to resolve most issues at MUSC.  Moreover, Smith's allegations against plaintiff set forth in her July 21, 2023 email on the subject were false and/or not credible.  The problem was with the product, not with plaintiff.  As new and as impressive as it is, the device is fraught with problems.  And Smith was well aware of this.  As Smith herself stated to plaintiff in an email dated August 11, 2023, she met with the customer on August 3, 2023 and they identified the following problems with the product:  Error rates, Reagent Cards kept getting stuck in the instruments, there was a high return rate with EPOC's, and that the PEDS, NICU and PICU are the units reporting most issues.  Thus, MUSC's hesitation to renew its contract with defendant on the EPOC product was a function of the product's shortcomings, not anything plaintiff did or did not do.  Indeed, by August 30, 2023, Smith sent an email to several upper-management employees stating that MUSC decided to sign the contract extension and to thereby give defendant another chance.  Thus, the contract was never lost.  In all events, plaintiff was never disciplined in any shape or fashion over the incident.  It was a routine circumstance or issue where a customer was considering whether or not to renew its contract with defendant due to issues with the product itself.  Thereafter, nothing else was said about it to plaintiff.

30

95.    That as all of the above unfolded, plaintiff continued to perform his job at defendant in exemplary fashion, plaintiff continued to meet his metrics and plaintiff continued to generate sales.  By mid-September of 2023 (the very month plaintiff was fired) plaintiff had generated $43 million in revenue, which was 6.4% over quota; that same year plaintiff would secure a $3.5 million contract with Baptist Health in South Florida and plaintiff would secure a $589,000 contract with Advent Health NXS.  Not only that, plaintiff's 2023 Peakon Scores, given by those who work with him, were outstanding:  8.5% out of 10 for team engagement; 9.5% out of 10 for performance; 7% out of 10 for goal setting; 8.9% out of 10 for growth; and 8.7% out of 10 for strategy.

96.    That on or about September 15, 2023, and despite plaintiff's performance and contributions to the company, Smith and Garcia fired plaintiff without reason, notice or cause and for false reasons or for reasons unworthy of credence.  When plaintiff asked why he had been fired, plaintiff was told "noncompliance with the company's travel policy" and "continued non-performance at MUSC."  Yet plaintiff never violated the travel policy.  There is no such evidence that he did.  And, MUSC is a profitable account plaintiff handled for years in a competent fashion.  The contract with MUSC was renewed, in large part due to plaintiff's efforts.  Indeed, defendant and MUSC still enjoy a contractual relationship with one another. Plaintiff did not "non-perform" at MUSC.

97.    That defendant's firing of plaintiff for false reasons and/or for reasons unworthy of credence is strong evidence that they really fired plaintiff because of his gender, his age, and for his past complaints of discrimination. This conclusion is strengthened by the fact that, after terminating plaintiff, Smith and Garcia hired Jennifer Ross-Lederer, a younger, less-qualified female to replace plaintiff.

98.    That in or around early October of 2023, a few weeks after firing plaintiff, Garcia and Smith fired another older male RVP, allegedly for violating Siemens' expense report policy.

99.    That in or around November of 2023 Smith held a Regional Vice President meeting in Nashville, Tennessee, attended by Smith, all of her direct reports, and a newly-hired female Human Resource employee assigned to the Southeast Zone.    Upon information and belief, other than Jim Luza, RVP for Siemens' West Region, *every person in attendance at the meeting was female*.    During the meeting employee survey responses (or Peakon scores) were discussed. Many of the employee responses on their Peakon surveys alleged there was a trend of reverse discrimination against males and an undertone of racism against white males at defendant.    Moreover, many of the survey responses stated that, "to get promoted at Siemens you have to be a woman."    Smith's responses to the employees' surveys were revealing.    To this point, in a sarcastic tone, she made the following public remarks:

❖ That she was tired of hearing about reverse discrimination against white males (a comment that is discriminatory on its face);

❖ That the POC National Sales meetings and the AACC conferences are all about drunken men hitting on women (a false statement – the conferences were productive); and

❖ Ultimately, Smith turned to Luza, the only male in attendance at the meeting, and gloated that she felt sorry for him because he lost his drinking buddies – a reference to her recent terminations of Stoga and plaintiff (a rude remark displaying a total lack of empathy).

100.   That along these same lines in 2022 or 2023, during  a Worldwide Town Hall Meeting, a high-level Human Resource employee at defendant acknowledged during her

presentation that she was aware that recently a lot of male employees at defendant had been raising gender discrimination complaints (or words to that effect).

101.   That finally, upon information and belief, Smith and Garcia were recently fired for their own serous performance issues.

102.   That when all was said and done, Garcia and Smith hired or promoted female employees into virtually every position that came open at defendant while they were in charge.  When necessary or applicable, those hirings or promotions were always preceded by the firing or non-selection of more qualified, older male employees.  Under the leadership of Smith and Garcia, the number of male RVP's shifted from five (5) males and one (1) female to one (1) male and three (3) females – or to one (1) male and six (6) females if one includes the fact that Smith and Garcia also hired Nicole Kirby ("Kirby") as the Regional Vice President Primary Care East Region, an employee with no sales management experience; Katie Souzzi ("Souzzi") as Regional Vice President Primary Care West Region, an existing employee also with no sales management experience; and Rachel Bishop ("Bishop"), as Inside Sales Manager - again a female with no sales experience.

## FOR A FIRST CAUSE OF ACTION: VIOLATION OF TITLE VII DISCRIMINATION/TERMINATION (BASED ON GENDER)

103.   That plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 102 hereinabove as fully as if set forth verbatim.

104.   That at all pertinent times as defined by Title VII, defendant employed fifteen (15) or more employees and, as such, defendant is an "employer" as defined by Title VII, and is otherwise subject to that Act.

105.   That plaintiff is male and, thus, a member of a protected class.

106.   That at the time of plaintiff's termination, and at all times prior thereto, plaintiff performed his job at defendant in a manner that met defendant's reasonable and legitimate expectations.

107.   That despite the above, upper management at defendant and in plaintiff's immediate chain of command were predominantly and/or all female; the female managers in plaintiff's chain of command, namely Zinn, Garcia and Smith, routinely made pro-female remarks and/or anti-male remarks and often publicly stated their philosophy that women were better suited for upper management roles in corporate America than males, regardless of the qualifications of the applicants.

108.   That consistent with these remarks and philosophies, when Garcia and Smith took over hiring and firing duties, they began to treat plaintiff and other males at defendant in a disrespectful, rude and dismissive manner, yelling at them, nitpicking their work, not listening to them, and disciplining them without warning or cause.  The said female upper management employees identified above treated females more favorably.

109.   That moreover, once Smith and Garcia were given full managerial authority, they began to systematically terminate competent male RVP's who were performing at a strong level, only to replace them with less-qualified or less-competent female employees.

110.   That ultimately on or about May 19, 2023, Smith and Garcia escalated discipline against the plaintiff, without warning or cause, by giving him a final written warning for issues that already had been addressed months earlier, and for issues that were false or unworthy of credence.

111.   That then on or about September 15, 2023 defendant (by and through Smith and Garcia) fired plaintiff - again, without warning, notice or cause and for blatantly false reasons and/or reasons so trivial they were not worthy of credence.

112.   That after terminating plaintiff, defendant replaced him with a less-qualified female (someone outside of plaintiff's protected class) either by hiring said female into plaintiff's position and/or by assigning her to perform the duties of plaintiff's job.  Moreover, defendant treated other similarly-situated female employees at defendant more favorably than it treated male employees, including the plaintiff, in that other female employees such as, but not limited to, May Coleman, who engaged in conduct similar to the conduct plaintiff was accused of committing and fired over, were not terminated.  Instead, they were promoted.

113.   That as such, defendant fired plaintiff because of his gender and thereby violated Title VII, 42 U.S.C. § 2000e-2 and 5.

114.   That  as a result of the above, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, expenses associated with finding other work, and has suffered severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, physical and personal injuries, and further seeks attorney's fees and costs and prejudgment interest.

115. That the defendant's actions as set forth above were undertaken intentionally, willfully, wantonly, recklessly, maliciously and with utter disregard for the federally protected rights of the plaintiff, and therefore plaintiff is entitled to recover punitive damages from the defendant.

**FOR A SECOND CAUSE OF ACTION:**
**VIOLATION OF TITLE VII**
**42 U.S.C § 2000e-3**
**RETALIATION/TERMINATION**

116.   That  plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 115 hereinabove as fully as if set forth verbatim.

117.   That at all pertinent times as defined by Title VII, defendant employed fifteen (15) or more employees and, as such, defendant is an "employer" as defined by Title VII, and otherwise subject to that Act.

118.   That plaintiff engaged in protected activity under Title VII by complaining to defendant's Human Resource employees that he was being discriminated against because of his gender and by otherwise opposing conduct made illegal by Title VII to said Human Resource employees.  Specifically, plaintiff engaged in protected activity under Title VII on or about May 26, 2023, June 22, 2023, July 20 and 21, 2023 and on or about August 10, 2023.

119.   That on or about September 15, 2023, defendant fired plaintiff without warning, notice or cause and for reasons that were false and/or unworthy of credence.

120.   That defendant fired plaintiff within just five (5) weeks after plaintiff last engaged in protected activity.   As such, the timing evidence, upper management's express animus towards males, the fact that defendant fired plaintiff for false reasons or reasons unworthy of credence, and plaintiff's comparator evidence, establish a causal connection between plaintiff's protected activity and his termination.

121.   That as such, defendant has violated Title VII, 42 U.S.C. § 2000e-3 by illegally terminating plaintiff in retaliation for plaintiff engaging in protected activity.

122.   That  as a result of the above, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, expenses associated with finding other work,

and has suffered severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, physical and personal injuries, and further seeks attorney's fees and costs and prejudgment interest.

123. That the defendant's actions as set forth above were undertaken intentionally, willfully, wantonly, recklessly, maliciously and with utter disregard for the federally protected rights of the plaintiff, and therefore plaintiff is entitled to recover punitive damages from the defendant.

<u>**FOR A THIRD CAUSE OF ACTION:**</u>
<u>**VIOLATION OF THE ADEA**</u>
<u>**TERMINATION BASED ON AGE**</u>

124. That plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 123 hereinabove as fully as if set forth verbatim.

125. That defendant is a "person" within the meaning of the ADEA, 29 U.S.C. § 630(a).

126. That defendant is in an industry that affects commerce and defendant employed twenty (20) or more employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar years and, thus, defendant is an employer as defined by the ADEA, 29 U.S.C. § 630(b).

127. That plaintiff was born in 1960 and, thus, was well over forty (40) years of age at the time of defendant's discriminatory conduct against him as alleged herein. Therefore, plaintiff was in a protected class and is otherwise a covered employee under the ADEA.

128.  That at all times pertinent under the ADEA, and throughout his employment with defendant, plaintiff performed his job duties there in a manner that met defendant's reasonable and legitimate expectations.

129.  That not only was upper management in plaintiff's chain of command female, they were also substantially younger than the plaintiff.  When Zinn, Garcia and Smith made their pro-female anti-male remarks or expounded that philosophy, they referred to older males – males substantially older than they were.

130.  That when these female managers treated males in a disrespectful, rude and dismissive fashion, and when they yelled at, nitpicked, and disciplined the male employees without warning, notice or cause, most of the time the male employees were substantially older than they were.

131.  That when they systematically began to terminate the competent male RVP's and replace them with less-qualified, less-competent female employees, the displaced male RVP's were almost always substantially older than the said supervisors and the female employees who replaced them.

132.  That as alleged, when the female managers gave plaintiff an unwarranted final written warning and fired him, the reasons they gave to plaintiff for their actions were false and/or unworthy of credence.

133.  That after defendant fired plaintiff, they replaced plaintiff with a substantially younger female (or assigned a substantially younger female to perform the duties of plaintiff's job).

134. That moreover, plaintiff's comparator, May Coleman, who engaged in conduct similar to (and, indeed, more egregious than) what defendant accused plaintiff of engaging in when it fired plaintiff, is substantially younger than plaintiff.

135. That as such, defendant fired plaintiff because of plaintiff's age and thereby violated the ADEA.

136. That as a direct result of the actions of the defendant, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, expenses associated with finding other work, economic injury, and plaintiff further seeks damages from the defendant in the form of reasonable attorney's fees and costs and prejudgment interest, all as authorized by the ADEA.

137. That defendant's actions as described above were undertaken intentionally, willfully, wantonly, knowingly and with reckless indifference to plaintiff's federally protected rights and, therefore, plaintiff is entitled to recover liquidated damages from the defendant.

## FOR A FOURTH CAUSE OF ACTION:
## VIOLATION OF THE ADEA
## RETALIATION

138. That plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 137 hereinabove as fully as if set forth verbatim.

139. That at all pertinent times as defined by the ADEA, defendant employed twenty (20) or more employees and, as such, defendant is an "employer" as defined by that Act and otherwise subject to it.

140. That plaintiff engaged in protected activity under the ADEA by complaining to defendant's Human Resource employees that he was being discriminated against because of his age and by otherwise opposing conduct made illegal by the ADEA to said Human

Resource employees. Specifically, plaintiff engaged in protected activity under the ADEA on or about May 26, 2023, June 22, 2023, July 20 and 21, 2023 and on or about August 10, 2023.

141. That on or about September 15, 2023, defendant fired plaintiff without warning, notice or cause and for reasons that were false and/or unworthy of credence.

142. That defendant fired plaintiff within just five (5) weeks after plaintiff last engaged in protected activity under the ADEA. As such, the timing evidence, upper management's stated animus towards older males, the fact that defendant fired plaintiff for false reasons or reasons unworthy of credence, and plaintiff's comparator evidence (which involved a substantially younger female) establish a causal connection between plaintiff's protected activity and his termination.

143. That as such, defendant has violated the ADEA by illegally terminating plaintiff in retaliation for engaging in protected activity.

144. That as a direct result of the actions of the defendant, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, expenses associated with finding other work, economic injury, and plaintiff further seeks damages from the defendant in the form of reasonable attorney's fees and costs and prejudgment interest, all as authorized by the ADEA.

145. That defendant's actions as described above were undertaken intentionally, willfully, wantonly, knowingly and with reckless indifference to plaintiff's federally protected rights and, therefore, plaintiff is entitled to recover liquidated damages from the defendant.

WHEREFORE, plaintiff prays for judgment against the defendant as follows:

(a) As to plaintiff's First and Second Causes of Action under Title VII, for such amount of actual and special damages as the trier of fact may find, (including lost back and

future wages, income and benefits, expenses associated with finding other work, severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, and physical and personal injuries), punitive damages, the costs and disbursements of this action, including plaintiff's reasonable attorney's fees, prejudgment interest and for such other and further relief as the court deems just and proper; and

      (b)   As to plaintiff's Third and Fourth Causes of Action, for such an amount of actual and special damages as the trier of fact may find, including damages for lost back and future wages, income and benefits, economic injury, as well as expenses associated with finding other work, prejudgment interest, the costs and disbursements of this action, including plaintiff's reasonable attorney's fees, liquidated damages, and for such other and further relief as the court deems just and proper.

HITCHCOCK & POTTS

By: *A. Christopher Potts*
A. Christopher Potts
Federal ID No.: 5517
222 West Coleman Blvd., Suite 124 #11
Mt. Pleasant, SC 29464
Telephone: (843) 577-5000
Email: cpotts@hitchcock-potts.com
***Attorneys for the Plaintiff***

Charleston, South Carolina
February 24, 2025